UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JERAD R. ANGLE,

        Plaintiff,

        v.

CITY OF NEWARK, *et al.*,

        Defendants.

Case No. 2:18-CV-266
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Chelsey M. Vascura

## OPINION AND ORDER

This matter is before the Court for consideration of Defendants' Motion for Summary Judgment (ECF No. 18); Plaintiff's Response in Opposition (ECF No. 26); and Defendants' Reply brief (ECF No. 29).  For the reasons that follow, the Court **GRANTS in part** Defendants' Motion for Summary Judgment.  (ECF No. 18).

## I.

### A.  Factual Background

Plaintiff Jerad Angle ("Plaintiff") began working as a City of Newark patrol officer in 2002.  (Pl.'s Dep. at 23:15–24:11, ECF No. 20-1).  During his career at the Newark Division of Police, Plaintiff received specialized training to become a self-defense instructor; an ASP baton instructor; and a lateral vascular neck restraint ("LVNR") instructor.  (*Id.* at 24:16–25).  Plaintiff also attended the Columbus SWAT Academy.  (*Id.* at 24:24–25:5).  As a patrol officer, Plaintiff served on Team 1.  (*Id.* at 8:14–18).  The Newark Division of Police Patrol Bureau is divided into seven teams.  Teams 1–6 perform general patrol duties, such as responding to 911 calls and serving warrants.  (Connell Aff. ¶ 3, ECF No. 18-1).  Team 7 is responsible for community

initiatives. (*Id.*). As part of a Collective Bargaining Agreement, patrol officers have the opportunity to switch teams in January and July each year. (Pl.'s Dep. at 80:4–81:5).

At the time this dispute arose, Team 1 consisted of Plaintiff and Officers Stevens, Duncan, Snode, Litzinger, Wesner, and Flemming. (Brnjic Dep. 9:5–18, ECF No. 19-3). Officer Snode was Plaintiff's partner. (Pl.'s Dep. at 50:5–6). In 2016, Sergeant John Brnjic ("Defendant Brnjic") became the Patrol Sergeant for Team 1. (Brnjic Dep. at 11:9–18). When Defendant Brnjic took medical leave from December 2016 to approximately April 2017, Sergeant Webster and Sergeant Doug Bline ("Defendant Bline") supervised Team 1. (*Id.* at 11:15–18; Bline Dep. 9:5–23, ECF No. 19-2). Chief Barry Connell ("Chief Connell") oversaw all supervisors as the Chief of the Newark Division of Police. (Connell Aff. ¶ 2).

### 1. Relationship Between Plaintiff and Defendant Brnjic

Defendant Brnjic testified that, after assuming a supervisory role over Team 1, "[w]hat I struggled with that team was balance." (Brnjic Dep. at 12:9–13:6). According to Defendant Brnjic's testimony:

> [Team 1 was] not a warrant squad. They were a patrol team. Their primary function and responsibility was to answer calls from our citizens. Angle, Snode, were very open that they were above that, that they shouldn't have to take those minor calls. They should go out and chase criminals all the time. So one of my challenges was, no your first response is taking calls and between the calls if you have time and if you want to go sit on the house if somebody has a warrant between calls, absolutely. When you're doing your reports, if you want to watch a house while you're typing your reports, that's fine. But you have to have balance between the two.

(*Id.* at 12:12–23). Defendant Brnjic further testified that Plaintiff routinely violated department policy by rolling his uniform sleeves up, displaying his tattoos, failing to drive the patrol car assigned to him, and circumventing the chain of command by speaking to Chief Connell directly. (*Id.* 74:13–80:18).

Plaintiff testified that he was reprimanded for his display of tattoos. (Pl.'s Dep. 46:9–13). However, Plaintiff stated that department tattoo policy "was never enforced until I got tattoos that showed . . . But I—but I did. I mean, when—you know, when they ordered me that I needed to start cover up—covering them up, I did." (*Id.* 46:16–23). In addition, Plaintiff testified "[t]here were days that I forgot my sleeves." (*Id.* at 46:24). Yet Plaintiff testified that when he got blood on his sleeves—and forgot an extra clean pair—"the sergeant that was on duty that day let me continue my shift, the rest of the day without them." (*Id.* at 47:1–6). According to Plaintiff's testimony, he tried to get along with Defendant Brnjic, because "I was under the assumption that he had our back and that he had our best interest in mind, but come May of 2017, I didn't trust him at all." (*Id.* at 34:3–6).

In his affidavit and deposition, Plaintiff testified to the following:

- Defendant Brnjic "told [Team 1] on numerous occasions that the harder that we worked on the street the more attention we were bringing to ourselves and the command staff didn't like us." (Pl.'s Aff. at 5, ECF No. 26-1).

- After Plaintiff had esophageal surgery—a procedure which forced Plaintiff to eat liquid food—"Sgt. Brnjic first made a comment about [Plaintiff] tearing his throat from sucking dick and immediately laughed. Sgt. Brnjic then informed [Plaintiff] that the administration did not like that Plaintiff was blending his meals at the station." (*Id.* at 6).

- When Plaintiff informed Defendant Brnjic that he intended to file a formal complaint against a captain in the department, "Sgt. Brnjic started laughing at Plaintiff and said 'no you aren't filing a complaint and I'm not going to let you.'" (*Id.* at 8).

- While Plaintiff and Officer Snode were responding to a scene, Defendant Brnjic called Plaintiff on the radio and said "come to the station and see me as soon as possible." (*Id.* at 9). When Plaintiff arrived at the station and asked what was wrong, Defendant Brnjic said "oh nothing, I just need you to sign a Power DMS document real quick." (*Id.*). Plaintiff "became angry and asked [Defendant Brnjic] why he would make it seem like something was wrong and order [Plaintiff] to leave Officer Snode by himself on a call. [Defendant Brnjic] replied 'this [was way] more fun.'" (*Id.*).

3

- In early 2016, "Sgt. Brnjic began coming into the briefing room daily, telling Plaintiff and his team that 'you all have a target on your back and it is just a matter of time.'" (*Id.* at 12).

- After calling Plaintiff into his office in late 2016, "Sgt. Brnjic just stared at Plaintiff for a minute and then said he had a problem. Plaintiff asked him what the problem was and Sgt. Brnjic stated that 'I have a 'rat' on my team.'" (*Id.* at 11).

According to Plaintiff's testimony, he did not report these incidents to Captain Riley, Defendant Brnjic's immediate supervisor. (Pl.'s Dep. at 48:22–49:6). Referring to Captain Riley, Plaintiff testified "I didn't trust him, but I got along with him." (*Id.* at 35:1–6). Plaintiff testified he did not believe speaking with Captain Riley would help "[b]ecause it had already been tried by other team members that went directly to Captain Riley to report Sergeant Brnjic, and nothing was done." (*Id.* at 35:7–13). For example, Plaintiff testified:

> Mike Snode went to Captain Riley, had told him, you know, all the things that Brnjic was saying to us and even reported that Brnjic had showed up on a call and played paper, rock, scissors with one of his suspects to see whether he went to jail or not.

(*Id.* at 35:16–23). Plaintiff testified that he assumed that Defendant Brnjic was not disciplined since Captain Riley never spoke to Defendant Brnjic or opened an internal investigation regarding complaints against Defendant Brnjic. (*Id.* at 36:10–25).

Instead of going to Captain Riley, Plaintiff reported Defendant Brnjic to Chief Connell "[b]ecause Chief Connell had an open-door policy, and I believe[d] that I could just go directly to him. It [was] my immediate supervisor that I have the problem with, and if the chief has an open-door policy, I'm going to the chief." (*Id.* at 49:8–12). In addition, Plaintiff acknowledged "[t]he chief was good friends with my partner, Mike Snode." (*Id.* at 50:5–6). At the meeting, Plaintiff testified that Chief Connell called Defendant Brnjic a "fuckin' liar" and said Defendant Brnjic "couldn't be trusted." (*Id.* at 49:17–22). Plaintiff testified that Chief Connell encouraged

him and the other members of Team 1 to file a formal complaint against Defendant Brnjic. (*Id.*).

However, when Plaintiff relayed his conversation with Chief Connell to Team 1, they refused to

file a formal complaint. (*Id.* at 51:12–18).

Defendant Brnjic testified that "Jerad [Angle] was my friend." (Brnjic Dep. at 58:10).

According to Defendant Brnjic, "I got along with Jerad. He was a character. He came to work.

I want to give him a fair—I'm not going to sit here and beat up on him. At times he did great

work and at times he did poor work. I felt as a boss, I was constantly challenged by him and

others." (*Id.* at 11:21–12:1). Moreover, Defendant Brnjic testified:

> Jerad [Angle] made the statement in here about I told him that he was being
> targeted. That is so false. What I told him is don't allow yourself to be a target.
> Wear your sleeves. Drive the car that's assigned to you. And one of the things
> that we talked about was his tattoos specifically . . . Follow the rules. As petty as
> they are, they're the rules.

(Id. at 75:23–76:21). Defendant Bline testified that he never heard a conversation between

Plaintiff and Defendant Brnjic "more than hey, sarg—type passing." (Bline Dep. at 94:21–24).

Defendant Bline further testified that he could not verify any facts in the Complaint asserting a

conflict between Defendant Brnjic and Plaintiff. (*Id.* at 95:3–9). In his deposition, Chief

Connell testified that Plaintiff "didn't like [Defendant Brnjic's] supervisory style." (Connell

Dep. at 65:18–20, ECF No. 19-1).

## 2. Alleged Harassment of Plaintiff by Other Newark Officers

Plaintiff testified that he "was the subject of continuing and ongoing harassment in the

workplace." (Pl.'s Aff. At 5). In addition to the incidents with Defendant Brnjic, Plaintiff listed

the following examples of harassment in his affidavit:

- After Plaintiff had esophageal surgery, "Captain Baum and Captain Haren
  came into the office. Captain Baum immediately looked at [Plainitff] and said
  'what's wrong, tear your throat from sucking so much dick?' Captain Baum
  and Captain Haren began laughing and made several other lewd, inappropriate

and derogatory comments about how it all finally caught up with Plaintiff." (*Id.* at 6).

- Captain Baum threw away the blender and meal supplies Plaintiff left in the break room following his esophageal surgery. (*Id.* at 7).

- After Plaintiff completed a handgun qualification exam, "Captain Logan began screaming at Plaintiff and said 'I don't give a fuck what you are doing. Clean your fucking gun and get the fuck out of here.'" (*Id.* at 8). While Plaintiff was cleaning his handgun, "Captain Logan aggressively approached Plaintiff and began pointing his finger in his face and telling him he was 'out of line and being unprofessional.'" (*Id.*).

- On June 28, 2016, Captain Logan took Plaintiff's tennis shoes and hid them "in an empty paper box outside his office under the shelf." (*Id.* at 10). Plaintiff was forced to walk barefoot to the administrative office. (*Id.*). As a result, Plaintiff told Chief Connell that he was "at his breaking point." (*Id.*).

- Detective Lyn Riley ("Detective Riley")—the wife of Captain Riley— engaged in "increasingly aggressive sexual behavior towards Plaintiff" from 2016 to 2017. (*Id.*). Detective Riley told Plaintiff "she was having 'bad thoughts' about him" and asked Plaintiff "if he had ever had sex in a horse stall or was into bondage." (*Id.*). Detective Riley sent Plaintiff screen shots of graphic Kindle novels and called him a "sissy" for refusing her advances. (*Id.* at 10–11).

### 3. Plaintiff's Affair with Heidi Clark

In March 2017, Heidi Clark ("Ms. Clark") came to the police station regarding a juvenile investigation of her child. (Bline Dep. 67:5–68:15). Plaintiff testified that he met Ms. Clark at the station. (Pl.'s Dep. 115:1–7). According to Defendant Bline's testimony, Plaintiff never filed a report about his conversation with Ms. Clark. (Bline Dep. at 68:4–10). Approximately a week later, Plaintiff began a romantic relationship with Ms. Clark. (Pl.'s Dep. 117:15–24). Ms. Clark had a criminal history, including charges for drug possession and assaulting a police officer. (Brnjic Dep. at 112:12–19). Plaintiff testified that he was not aware of Ms. Clark's drug charge at the time he met her. (Pl.'s Dep. at 115:13–14). In his deposition, Plaintiff testified to the following:

6

> Q. So then at some point in time, you tell your colleagues on Team 1 that you're in this relationship with Heidi Clark; is that correct?
>
> A. Yes.
>
> Q. When do you tell them?
>
> A. As we were still texting and stuff.
>
> Q. So you publicized it among your friends at the department that you're having an affair with the woman.
>
> A. Yes.

(*Id.* at 122:1–10) (emphasis in original).

Officer Snode counseled Plaintiff against sharing details about his affair. (*Id.* at 122:11–21). After the affair became public knowledge, Defendant Brnjic had several conversations with Plaintiff regarding Ms. Clark. (*Id.* at 124:6–10). Plaintiff testified that Defendant Brnjic stated: "I can't believe your fuckin' team still even wants to have your back. You know, [Ms. Clark is] a fuckin' piece of shit. She's a fuckin' drug dealer." (*Id.* at 124:10–14). Plaintiff further testified that when he asked Defendant Brnjic whether his affair violated policy, Defendant Brnjic would respond "[w]ell, we'll see." (*Id.* at 124:15–20). When asked if he ever called Ms. Clark derogatory names in front of Plaintiff, Defendant Brnjic responded: "[i]t depends what you consider derogatory . . . I don't remember what I said verbatim. I know I referenced her as a drug dealer." (Brnjic Dep. at 29:6–12).

Plaintiff's wife, Melanie Angle, a former detective and Newark Police reserve officer, found out about his affair in early May 2017. (Pl.'s Dep. at 116:23–117:14). That same day, Plaintiff spoke with Chief Connell over the phone and asked for "personal advice on how he should handle [the situation]." (Connell Dep. at 29:17–30:11). Chief Connell testified that:

> I suggested that he stay with his parents that evening in order to not further aggravate the situation that was at hand. Talked to him that he had kids involved

and that should be his primary focus for both he and his wife. He said that he was done with the marriage. And I said that I would hold off judgment on that. Let things calm down.

(*Id.* at 31:19–24).

According to Chief Connell, he spoke with Plaintiff over the phone again the following day. (*Id.* at 33:9–12). Chief Connell testified:

> A. We talked about it and he brought up, wanted to know if he was in trouble for this relationship. Never identified who the person was that he was having the extramarital affair with. Said that she had a felony conviction from years ago.
>
> Q. Okay. And what was your response?
>
> A. My response was that's not enough information for me to even say whether it's a policy violation. It could be.
>
> Q. Did he ask you anything further, was it a policy violation to date a known felon?
>
> A. That was just the one conversation of asking me if it's a policy violation.

(*Id.* at 34:5–17).

Plaintiff testified that he "self-reported" his affair by calling Chief Connell:

> Q. So you told us then you talked to Chief Connell about this, what you call self-reporting.
>
> A. Mm-hmm.
>
> Q. And what did you say to him?
>
> A. Well, I—I think we already talked about it, when I asked him, you know, if I was violating policy, you know, and I told him everything that Brnjic had said. 'Brnjic's a fuckin' liar.' And, like, the answer was, '[i]t's all in how it's perceived. I've got an uncle that's a felon.' And that was the end of it. And then I just—literally—after—after I talked to Connell, I really didn't even worry about it anymore. I was just kind of, like, well you know—my wife knew.

(Pl.'s Dep. at 145:6–20).

8

### 4. Internal Investigation of Plaintiff

In late May, Defendant Brnjic discovered that Plaintiff had approached Chief Connell

regarding his affair with Ms. Clark.  (Brnjic Dep. at 19:6–20:15).  Defendant Brnjic testified that:

A.  [A]fter my conversation with [Deputy Chief] McKee when he told me that Jerad Angle had self-reported to the chief, that he had violated a policy, I became upset.

Q.  What policy had he violated?

A.  Chain of command violation.

Q.  And whose policy is that?

A.  The department's policy.

Q.  Where is that located, what manual?

A.  In the general orders.

Q.  You don't remember?

A.  No.

Q.  Do you know what the general orders says?

A.  Basically the chain of command.  The chain of command is me, then the DC and the chief.  I don't know what it says word-for-word or verbatim or anything like that.  I know following the chain of command is outlined in the general orders.

Q.  What is [Deputy Chief] McKee's relationship to Officer Angle?

A.  It's his brother-in-law.

(*Id.* at 21:3–21).

Defendant Brnjic testified that when he went to Captain Riley's office:

[W]e spoke about [Plaintiff's self-reporting] because it's been an ongoing issue with my team about violating the chain of command and going right to the chief and not utilizing me or DC Riley.  And I said we had discussed that if it happens again, somebody purposely violates the chain of command, that I was going to issue a reprimand.  I asked if I could move forward with that, and he said, yes.

(*Id.* at 22:17–24).

Defendant Brnjic planned to issue a reprimand to Plaintiff for violating the chain of command. (*Id.* at 24:5–22). However, Defendant Brnjic testified that Chief Connell instructed him to withdraw the reprimand "[b]ecause he wanted an open-door policy." (*Id.* at 30:8–31:11). In addition, Defendant Brnjic testified that Captain Riley asked him to "investigate and verify" whether Plaintiff committed a policy violation by engaging in a relationship with a felon. (*Id.* at 25:7–14). Accordingly, Defendant Brnjic began an internal investigation of Plaintiff for a code of conduct violation. (*Id.* at 38:19–24). During the course of his investigation, Defendant Brnjic asked Defendant Bline to find out whether Ms. Clark had been convicted of a crime. (*Id.* at 34:17–35:12). According to Defendant Bline's testimony, Defendant Brnjic did not mention Plaintiff's name in connection with Ms. Clark. (Bline Dep. at 53:14–23).

When Defendant Bline accessed the Ohio Law Enforcement Gateway ("OHLEG") to research Ms. Clark's criminal history, he saw that Plaintiff had recently searched Ms. Clark's name. (*Id.*). Plaintiff does not dispute that he accessed OHLEG to run a check on Ms. Clark. (Pl.'s Dep. at 126:2–5). However, Plaintiff maintains that he did so in response to Defendant Brnjic's alleged negative comments regarding Ms. Clark. (*Id.* at 126:10–127:8). Specifically, Plaintiff testified:

> Q. Well, [was the OHLEG check] part of an official investigation?
>
> A. Well, I'm guessing if I'm on duty and my direct supervisor is telling me that, you know, this person's being investigated, I have a duty to find out if it's happening, because I need to self-report, which essentially I did anyway.

(*Id.* at 126:9–14). Defendant Bline informed Defendant Brnjic of Plaintiff's OHLEG access. (Bline Dep. at 53:14–54:9). On June 4th, 2017, Defendant Brnjic explained that Plaintiff was under investigation for dating a felon. (*Id.*). Defendant Bline testified that:

10

Q. To your knowledge, was Jerad Angle ever issued a reprimand for a code of conduct violation for dating a known felon?

A. No. That investigation ceased when it became criminal.

Q. There was an investigation regarding whether it was a policy violation?

A. Well, again, once I, on the 4th, once I discovered that that had occurred, it became more or less criminal at that point. So I'm not in position because I'm not—that would be a question for the chief and Sergeant Brnjic to answer. But my understanding is once I discovered that, this became a criminal matter and there was really no reason to push forward with that at that time until it became internal. So if the criminal was cleared up, it would come back to the internal part.

(*Id.* at 55:6–21).

### 5. Criminal Investigation and Indictment of Plaintiff

Chief Connell placed Plaintiff on administrative leave in early July 2017. (Pl.'s Dep. at 149:5–14). Initially, Defendant Brnjic was assigned to criminally investigate Plaintiff for unauthorized access of OHLEG. (Brnjic Dep. at 55:15–20). Defendant Brnjic testified that Chief Connell removed him from the investigation in its beginning stages. (*Id.* at 55:24–57:16). Defendant Bline finished the investigation by auditing OHLEG records; conducting interviews of Plaintiff, Ms. Clark, and other individuals in the department; and reviewing Plaintiff's phone records. (Bline Dep. at 65:18–66:15; Bline Exhibits 21 & 22). According to Defendant Bline's investigation, Plaintiff accessed Ms. Clark's name in OHLEG three times. (Bline Exhibit 21). In addition, Plaintiff ran name checks on several individuals associated with Ms. Clark, including her husband and her suspected meth supplier. (*Id.*). On August 23, 2017, a grand jury indicted Plaintiff on four counts of unlawful access to a law enforcement database. (Pl.'s Exhibit 8, ECF No. 1-9). Plaintiff was issued a summons to appear. (*Id.*).

### 6. Plaintiff's Hospitalization and Resignation

On August 9, 2017, Plaintiff was admitted to SUN Behavioral Health after suffering a nervous breakdown. (Pl.'s Exhibit 6, ECF No. 1-7). According to his Affidavit, "Plaintiff could not understand the nature of the allegations the department was making against him, and, as a result, could not sleep for three days." (Pl.'s Aff. at 18). Plaintiff was diagnosed with post-traumatic stress disorder and generalized anxiety disorder. (Pl.'s Exhibit 6). Plaintiff's medical provider noted "[p]roblems at work" were a psychosocial stressor for Plaintiff. (*Id.*). Plaintiff was released six days later, "and was advised not to be around the administration or employees of the NPD for fear he may become violent." (Pl.'s Aff. at 18).

On November 17, 2017, Plaintiff submitted his resignation to the Newark Division of Police and the Ohio Peace Officer Commission. (Pl.'s Exhibits 19  20, ECF Nos. 1-20 & 1-21). According to Licking County prosecutor Paula Sawyers ("Ms. Sawyers"), the Government filed a motion to dismiss the charges in exchange for Plaintiff's resignation. (Sawyers Dep. at 21:24–23:7). Plaintiff testified that no such agreement ever existed:

> Q.  And this dismissal of these criminal charges was based upon an agreement that you had reached with the prosecutor; isn't that correct?
>
> A.  No.

(Pl.'s Dep. at 167:9–12). Following his resignation, Plaintiff filed claims for unemployment benefits and worker's compensation. (*See* Pl.'s Exhibit 24, ECF No. 1-25; Pl.'s Exhibit 25, ECF No. 1-26). The Ohio Department of Job and Family Services denied Plaintiff's request for unemployment benefits. (Pl.'s Exhibit 24). Plaintiff's Worker's Compensation claim was allowed for the following medical conditions: (1) sprain in the lumbar region, (2) sprain in the thoracic region, and (3) contusion of the hand(s). (Pl.'s Exhibit 25). In addition, the Ohio

Bureau of Workers' Compensation granted Plaintiff's claim for acute post-traumatic stress

disorder in February 2018. (*Id.*).

In his Affidavit, Plaintiff referenced several incidents that occurred while he was a patrol

officer that allegedly led to his diagnosis of PTSD. (Pl.'s Aff. at 1). Plaintiff testified as follows:

- In the fall of 2014, Plaintiff witnessed the shooting of Officer Conley during a vehicle stop. (*Id.* at 2). Plaintiff accompanied Officer Conley when he was airlifted to the hospital; sealed the evidence; and coordinated the notification of Officer Conley's wife. (*Id.*). Plaintiff was not debriefed or ordered to counseling regarding the incident. (*Id.* at 3).

- In August 2015, Plaintiff responded to a call that an assault was taking place at the Mill Wheel Bar. (*Id.* at 3). Plaintiff chased the suspects on foot. (Id.). When Plaintiff caught up with Suspect #1, he deployed his taser. (Id.). Suspect #1 attacked Plaintiff and placed him in a "bear hug." (*Id.*). Plaintiff and Suspect #1 became entangled in the taser wires during a fight which lasted over two minutes. (*Id.*). Suspect #1 made several attempts to get Plaintiff's taser and gun. Plaintiff was transported to the hospital for a neck and back injury. (*Id.*). Suspect #1 saw Plaintiff at the hospital and yelled he was "going to find Plaintiff's wife and children and kill them all." (*Id.*). Plaintiff did not receive a debrief or counseling. (*Id.*). However, "Plaintiff began having nightmares on a regular basis, involving his duties as an officer, such as his gun jamming, being stabbed, and being attacked by multiple subjects. (*Id.* at 4). Plaintiff began relying on pain killers to sleep. (*Id.*).

- In August 2016, Plaintiff and Team 1 were tasked with apprehending "serious criminals." (*Id.*). Team 1 was unsuccessful. (*Id.*). "Later it was learned that these same criminals were responsible for the murder of an officer in Hatch, New Mexico and a carjacking of an individual causing serious bodily-harm to the victim." (*Id.*).

- In August 2016, Plaintiff met with Chief Connell and reported that he was having mental health problems. "Chief Connell agreed and stated that he could tell Plaintiff and other members of his team were struggling." (*Id.*).

In addition to citing these incidents, Plaintiff testified "[t]he harassment by the command

staff was relentless and never stopped and fueled my PTSD." (*Id.* at 23). Officer Litzinger

testified she noticed Plaintiff's "behavior change dramatically in late April early May 2017."

(Litzinger Aff. ¶ 3). Officer Litzinger testified that Plaintiff "was on the edge, not at ease, and

any little thing would set him off . . . [into] a major outburst, red-face and veins popping out of his head." (*Id.*). Officer Litzinger further testified that despite Plaintiff's obvious deterioration, he was not ordered to counseling, and the "Command staff fueled and targeted the rage of [Plaintiff] by stealing and secreting his personal belongings and making unnecessary and unwarranted confrontations." (*Id.* ¶ 5). Officer Stevens testified that Plaintiff's "behavior was obvious and the chain of command was fully aware of his angry outbursts and need for help and assistance." (Stevens Dep. ¶ 5). Officer Stevens further testified that "Sgt. Brnjic openly confronted and harassed [Plaintiff] in muster and in passing." (*Id.*).

According to Chief Connell's testimony, he suggested that Plaintiff seek mental health treatment during one of their meetings. (Connell Dep. at 123:6–20). Chief Connell testified that he made a phone call to Human Resources recommending counseling within 24 hours of the meeting. (*Id.* at 121:2–13). Chief Connell did not order Plaintiff to go to counseling. (*Id.* at 119:14–120:6). Instead Chief Connell testified: "I expressed that I don't want to know the details of any of it. I'm just asking [Plaintiff] to consider going to counseling." (*Id.* at 120:4–6). Plaintiff testified as follows, regarding Chief Connell's suggestion:

> Q. Why didn't you seek help when it was suggested to you in August from the chief?
>
> A. Let's—let's be realistic. Nobody, especially in our position—I'm not going to boohoo. I had a moment with Chief Connell where I laid everything out. I was senior on my team. And it's embarrassing. It's embarrassing. I mean, it's embarrassing to feel and to act like I have the last couple years, if you want my honest opinion. It's embarrassing. I mean, I'd be the talk of the police department, you know, which I already am. But it's—it's fuckin' embarrassing.

(Pl.'s Dep. at 64:3–15).

**B. Procedural Background**

Plaintiff initiated the instant action against Chief Connell, Defendant Brnjic, Defendant Bline, Captain Baum, Captain Haren, Sergeant Eskins ("Defendant Officers"), and the City of Newark (collectively "Defendants") on March 27, 2018. (ECF No. 1). Plaintiff alleges nine counts, including: (1) false arrest under 42 U.S.C. § 1983 and Ohio law;[1] (2) civil conspiracy under § 1983 and Ohio law; (3) malicious prosecution under § 1983 and Ohio law;[2] (4) harassment; (5) intentional infliction of emotional distress; (6) respondent superior; (7) indemnification; (8) defamation; and (9) invasion of privacy or false light. (*See generally* Compl., ECF No. 1). Defendants moved for summary judgment on February 28, 2019. (ECF No. 18). Plaintiff responded (ECF No. 26), and Defendants replied (ECF No. 29). This motion is now ripe for review.

## II.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When

---

[1] Plaintiff refers to Count 1 as "42 U.S.C. § 1983 Violation of the Fourth Amendment—False Arrest." (*See* Compl. ¶ 93–94). However, in his Opposition, Plaintiff references Ohio law when arguing his false arrest claim. (Opp'n at 28–30, ECF No. 26).

[2] The Court notes that Plaintiff characterizes his malicious prosecution cause of action as a "State Law Claim" in his Complaint. (*See* Compl. ¶ 117–118). However, Plaintiff cites to 42 U.S.C. § 1983 when pleading this cause of action. (*Id.* ¶ 118–139).

evaluating a motion for summary judgment, the evidence must be viewed in the light most

favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

## III.

Initially, the Court will consider Plaintiff's federal law claims brought under 42 U.S.C. §

1983, including: (1) false arrest, (2) civil conspiracy, and (3) malicious prosecution.

### A. Defendant Officer Liability Under Section 1983

Section 1983 is "not itself a source of substantive rights," rather it provides plaintiffs with

a method for "vindicating rights otherwise conferred." *Graham v. Connor*, 490 U.S. 386, 393–

394 (1989). "To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a

right secured by the Constitution or laws of the United States and must show that the deprivation

of that right was committed by a person acting under color of state law." *Harbin-Bey v. Rutter*,

420 F.3d 571, 575 (6th Cir. 2005) (citing *West v. Atkins,* 487 U.S. 42, 48 (1988)).

Defendants move for summary judgment, arguing that the Defendant Officers are entitled

to qualified immunity from Plaintiff's § 1983 claims. (Mot. for Summ. J. at 11, ECF No. 18).

The doctrine of qualified immunity shields "government officials performing discretionary

functions . . . from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known."

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Hills v. Kentucky*, 457 F.3d 583, 587 (6th Cir.

2006). "Plaintiff bears the burden of showing that defendants are not entitled to qualified

immunity." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (citing *Untalan v.

City of Lorain,* 430 F.3d 312, 314 (6th Cir. 2005)).

"Plaintiff must show both that, viewing the evidence in the light most favorable to [him],

a constitutional right was violated and that the right was clearly established at the time of the

violation." *Id.* (citations omitted).  "If plaintiff fails to show either that a constitutional right was violated or that the right was clearly established, [he] will have failed to carry [his] burden." *Id.* In determining whether the required showing has been made, the trial court has discretion to decide which of the two elements to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Yet, "when the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury, the jury becomes the final arbiter of a claim of immunity." *Bouggess v. Mattingly,* 482 F.3d 886, 888 (6th Cir. 2007) (internal quotation marks and alterations omitted).

## 1. False Arrest

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Village of Timberlake, Ohio,* 412 F.3d 669, 677 (6th Cir.2005) (citing *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002)); *see also Brooks v. Rothe,* 577 F.3d 701, 706 (6th Cir. 2009).  "A police officer has probable cause if there is a 'fair probability' that the individual to be arrested has either committed or intends to commit a crime." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (citing *Northrop v. Trippett*, 265 F.3d 372, 379 (6th Cir. 2001) and *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

Plaintiff argues that he "was indicted on 4 felony counts based on an internal criminal investigation conducted by the very people, alleged by Plaintiff, to have harassed and conspired against [him] and were key witnesses in the investigation." (Opp'n at 28).  Moreover, Plaintiff avers that "Defendants['] acts were malicious, and in bad faith, wanton and reckless." (*Id.* at 29).  Defendants contend that Plaintiff was never arrested, and "[a]s such, [Plaintiff's] § 1983

clai[m] for false arrest . . . must fail as a matter of law." (Mot. for Summ. J. at 16).  This Court

agrees with Defendants.  During his deposition, Plaintiff testified as follows:

> Q. . . . Your claim, for instance, that you were falsely arrested.
>
> A. (Nodded head up and down).
>
> Q. And you're suggesting that there was no, what, probable cause for that?  Is that what your belief is?
>
> A. Yes.
>
> Q. All right.  But you weren't—were you actually arrested?
>
> A. No.
>
> Q. All right.  You were issued a summons?
>
> A. Mm-hmm.

(Pl.'s Dep. at 178:25–179:11).

Accordingly, there is no genuine dispute of material fact regarding prong one of the

qualified immunity analysis.  The parties agree that Plaintiff was never arrested—precluding a

finding that the Defendant Officers committed a constitutional violation by falsely arresting

Plaintiff.  Therefore, the Court **GRANTS** summary judgment in favor of the Defendant Officers

on Plaintiff's § 1983 false arrest claim.

## 2. Civil Conspiracy

A federal "civil conspiracy is an agreement between two or more persons to injure

another by unlawful action." *Hooks v. Hooks*, 771 F.2d 935, 943 (6th Cir. 1985).  No express

agreement between the conspirators is necessary to find a civil conspiracy.  *Id.* at 944.  In fact,

"[e]ach conspirator need not have known all of the details of the illegal plan of all of the

participants involved.  All that must be shown is that there was a single plan, that the alleged

coconspirator shared in the general conspiratorial objective, and that an overt act was committed

18

in furtherance of the conspiracy that caused injury to the complainant." *Id.* "It is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state a claim under § 1983." *Huffer v. Bogen*, 503 F. App'x 455, 461 (6th Cir. 2012) (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987)).

In the instant action, Plaintiff alleges that the Defendant Officers "took concrete steps to enter into an agreement to unlawfully arrest the Plaintiff, knowing they lacked probable cause to do so, and for the purpose of violating Plaintiff's Fourth and Fourteenth Amendment rights." (Opp'n at 32).  Plaintiff argues that each of the Defendant Officers "committed specific overt acts" by "using unreasonable tactics in the investigation and fabricating evidence against the Plaintiff, and approving trumped up charges against him, which resulted in his unlawful arrest for a felony." (*Id.*).  Specifically, Plaintiff contends that "Sgt. Bline knew some of the statements contained within [his criminal investigative] Report were not based upon any fact, but pure conjecture and speculation." (*Id.* at 8).  Plaintiff cites the following paragraph from Defendant Bline's report as speculative:

> The timing and the way the request was made raised some very real concerns after the OHLEG violations . . . The [Plaintiff] could alert the criminal that the raid was coming which would allow the criminal to destroy evidence, move or even ambush officers.

(Pl.'s Exhibit 5 at 10, ECF No. 1-6).

In addition, Plaintiff seems to allege a Fourteenth Amendment due process violation against the Defendant Officers for failing to disclose exculpatory evidence.  Plaintiff highlights the following section of Defendant Bline's testimony:

> Q. As part of your investigation were you able to determine or approve any correspondence, information, given from [Plaintiff] to Ms. Clark regarding any information from LEADS or otherwise?

A. No.

(Pl.'s Opp'n at 9) (citing Bline Dep. at 108:7–11).  Plaintiff also contends that Defendant Bline's

report did not disclose there was no active investigation into Ms. Clark for drug trafficking.  (*Id.*)

(citing Brnjic Dep. at 114:15–17).

Defendants point out that Plaintiff "must allege an actual deprivation of rights, as the

'gist of the section 1983 cause of action is the deprivation and not the conspiracy.'" (Mot. for

Summ. J. at 18) (quoting *Miller v. Meyer*, No. 2:14-CV-101, 2014 WL 5448348 (S.D. Ohio Oct.

23, 2014)).  Here, Defendants argue that Plaintiff "cannot demonstrate a Fourth Amendment

violation." (Mot. for Summ. J. at 18).  Specifically, Defendants contend "[i]t remains unclear as

to what conduct of [Defendant] Bline, [Defendant] Brnjic, or Chief Connell was attributable to

any alleged deprivation" of Plaintiff's constitutional rights.  (*Id.* at 13).  In addition, Defendants

argue Plaintiff "fails to identify what injury resulted from the alleged conspiracy, who

participated in the alleged conspiracy, or what unlawful act occurred independently from the

conspiracy." (Reply at 10, ECF No. 29).

### a.  Fourth Amendment Violation

"It is well established that a person's constitutional rights are violated when evidence is

knowingly fabricated and a reasonable likelihood exists that the false evidence would have

affected the decision of the jury." *Ferris v. City of Cadillac, Mich.*, 726 F. App'x 473, 478 (6th

Cir. 2018) (citing *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)).  "A Fourth

Amendment claim for fabrication of evidence lies where a defendant knowingly manufactures

probable cause, thereby effecting a seizure." *Id.* (citing *Spurlock v. Satterfield*, 167 F.3d 995,

1006 (6th Cir. 1999)).  In *Robertson v. Lucas*, 753 F.3d 606 (6th Cir. 2014), the appellants

asserted § 1983 false arrest, malicious prosecution, and fabrication of evidence claims against the

20

appellees. *Id.* at 619. The Sixth Circuit concluded that "because there was probable cause to arrest and detain appellants, they cannot prevail on their fabrication of evidence claim as they were not wrongfully seized. *Id.* Due to the lack of a constitutional violation, the court held that the "appellees were therefore entitled to qualified immunity on these claims." *Id.*

The Court finds *Lucas* instructive. Here, Plaintiff does not raise a genuine dispute of material fact that he was seized. As noted *supra*, Plaintiff testified that he was never arrested. (Pl.'s Dep. at 178:25–179:11). Nor is there any evidence to suggest that Plaintiff was ever detained. (*See generally* Pl.'s Dep.). Accordingly, like the appellants in *Lucas*, Plaintiff cannot prevail on a Fourth Amendment fabrication of evidence claim because he was not wrongfully seized as the result of manufactured probable cause. In the absence of a Fourth Amendment violation, the Defendant Officers are entitled to qualified immunity on Plaintiff's conspiracy to fabricate evidence claim.

### b. Fourteenth Amendment Violation

"The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution prohibits prosecutors from concealing evidence favorable to a defendant, but '[t]here is no general constitutional right to discovery in a criminal case.'" *State v. McKelton*, 148 Ohio St. 3d 261, 271 (Ohio 2016) (citing *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)). "[I]f the government does fail to disclose Brady material, the defendant has a constitutional remedy for the nondisclosure only if the defendant can show that there is a reasonable probability that 'the omission deprived the defendant of a fair trial.'" *United States v. Presser*, 844 F.2d 1275, 1282 (6th Cir. 1988) (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)).

The parties agree that Plaintiff never went to trial. All criminal charges against Plaintiff were dismissed by the Licking County Court of Common Pleas on December 12, 2017. (Pl.'s

Exhibit 23, ECF No. 1-24). Consequently, Plaintiff cannot raise a genuine dispute of material fact that the Defendant Officers committed a Fourteenth Amendment violation by failing to disclose exculpatory evidence at trial. Thus, the Defendant Officers are entitled to qualified immunity on Plaintiff's Fourteenth Amendment civil conspiracy claim.

Because Plaintiff's § 1983 conspiracy claims against the Defendant Officers are barred by qualified immunity, the Court **GRANTS** summary judgment to Defendants on these claims.

### 3. Malicious Prosecution

The Sixth Circuit recognizes a viable claim of malicious prosecution under the Fourth Amendment. *Barnes v. Wright*, 449 F.3d 709, 715–16 (6th Cir. 2006). A § 1983 claim for malicious prosecution "encompasses wrongful investigation, prosecution, conviction, and incarceration." *Id.* In *Skyes v. Anderson*, the Sixth Circuit articulated the elements of a Fourth Amendment malicious prosecution claim. 625 F.3d 294, 308 (6th Cir. 2010). First, the plaintiff must demonstrate a criminal investigation was initiated against him/her, and the defendant "ma[d]e, influence[d], or participate[d] in the decision to prosecute." *Id.* (quoting *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007)). Second, the plaintiff must show the defendant lacked probable cause for the criminal prosecution. *Id.* Third, the plaintiff must prove the plaintiff suffered a "deprivation of liberty" (besides the initial seizure) as a result of the criminal prosecution. *Id.* (quoting *Johnson v. Knorr*, 477 F.3d 75, 81 (3d Cir. 2007)). Fourth, the criminal prosecution must have ended in favor of the plaintiff. *Id.* at 309.

Defendants aver that Plaintiff's malicious prosecution claims "fail as a matter of law as the record demonstrates probable cause existed and no Fourth Amendment violation occurred." (Mot. for Summ. J. at 15). According to Defendants, a grand jury indictment establishes a

rebuttable presumption of probable cause.  (*Id.* at 16) (citing *Jerome v. Crum*, 695 F. App'x 935,

943 (6th Cir. 2017).  To overcome this presumption, the plaintiff must show:

> a law-enforcement officer, in the course of setting a prosecution in motion, either
> knowingly or recklessly makes false statements (such as in affidavits or
> investigative reports) or falsifies or fabricates evidence; (2) the false statements
> and evidence, together with any concomitant misleading omissions, are material
> to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence,
> and omissions do not consist solely of grand-jury testimony or preparation for that
> testimony . . .

(*Id.*) (citing *Miller v. Maddox*, 866 F.3d 386, 391 (6th Cir. 2017)).  Defendants argue that

Plaintiff cannot overcome the presumption because "there was sufficient evidence that the crime

was committed—Plaintiff accessed OHLEG on different occasions to run searches on Ms. Clark

and her companions without authorization." (Mot. for Summ. J. at 16–17).

Plaintiff disputes that the Defendant Officers had probable cause to set a prosecution into

motion.  Although Plaintiff testified that he accessed OHLEG, he also testified that he believed

his access was job-related.  (Pl.'s Dep. at 128:15–18).  Specifically, Plaintiff testified:

Q.  But you know now that [accessing OHLEG] was wrong.

A.  No.  I still don't know.  I still don't believe that.

Q.  All right.  So you claim that the access that you made on May 8ᵗʰ as to her,
Heidi Clark, was somehow job related.

A.  Absolutely, because I'm still—these conversations with Sergeant Brnjic— . . .
Yes, yes.  I believe that it was job related, yes.

(*Id.* at 129:21–130:5).  Plaintiff further argues the presumption in favor of probable cause is

rebuttable because the Defendant Officers acted "willfully, maliciously, in bad faith, and in

reckless disregard of Plaintiff's federally protected constitutional rights."  (Opp'n at 36).

Despite the parties' factual dispute regarding the existence of probable cause, Plaintiff's §

1983 malicious prosecution claim fails as a matter of law.  To succeed on his claim, Plaintiff

must prove he suffered a "deprivation of liberty" as a result of a criminal prosecution. *Skyes*,

625 F.3d at 308. Nothing in the record indicates that Plaintiff was ever deprived of liberty.

Plaintiff testified he was never arrested. (Pl.'s Dep. at 178:25–179:11). In addition, the record

unequivocally demonstrates that the Defendant Officers had probable cause for the charge that

Plaintiff illegally accessed OHLEG records as to a paramour, who was not part of a bona fide

police investigation.[3]  Consequently, no reasonable jury could find that Plaintiff satisfied the

elements of a § 1983 malicious prosecution analysis. Because Plaintiff failed to raise a genuine

dispute of material fact regarding whether he suffered a deprivation of liberty, the Court

**GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's § 1983 malicious

prosecution claim.

## B. *Monell* Liability Under Section 1983

Plaintiff names the City of Newark as a Defendant for its alleged failure to train the

Defendant Officers. A municipality may be liable for its police officer's unconstitutional acts if

the police department's failure to train amounts to "deliberate indifference to the constitutional

rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489

U.S. 378, 379 (1989). To trigger municipal liability under § 1983, the deprivation of

constitutional rights must have occurred "pursuant to official municipal policy of some nature."

---

[3] Ohio Revised Code ("O.R.C.") § 2913.04(C) states that:

> [n]o person shall knowingly gain access to, attempt to gain access to, cause access to be granted to, or disseminate information gained from access to the law enforcement automated database system created pursuant to section 5503.10 of the Revised Code without the consent of, or beyond the scope of the express or implied consent of, the chair of the law enforcement automated data system steering committee.

Pursuant to O.R.C. § 2913.04(H), "[w]hoever violates division (C) of this section is guilty of unauthorized use of the law enforcement automated database system, a felony of the fifth degree."

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 691 (1978).  Put another way, the police department's official policy must be the "moving force of the constitutional violation." *Id.* at 694.

To establish deliberate indifference and failure to train under *Monell*, the plaintiff must demonstrate four elements: (1) the defendant officer committed a constitutional violation, (2) the "City's training program was inadequate for the task that officers must perform," (3) "the inadequacy was the result of the City's deliberate indifference," and (4) "the inadequacy was closely related to or actually caused the injury." *Wilson v. Morgan*, 477 F.3d 326, 340 (6th Cir. 2007) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006)).

Defendants move for summary judgment on this claim, arguing that Plaintiff "is unable to demonstrate a Fourth Amendment violation of any kind, which entirely undermines his § 1983 claims as a municipality cannot be held liable 'absent an underlying [c]onstitutional violation by officers.'" (Mot. for Summ. J. at 15) (citing *Katz v. Village of Beverly Hills*, 677 F. App'x 232, 238 (6th Cir. 2017)).  Defendants aver that Plaintiff "has also failed to point to a specific policy or custom of the City of Newark" which resulted in a constitutional violation.  (*Id.*).  This Court agrees.  As discussed *supra*, Plaintiff failed to raise a genuine dispute of material fact that the Defendant Officers committed Fourth or Fourteenth Amendment constitutional violations.

Because no reasonable jury could find that Plaintiff satisfied the first prong of *Monell*, the Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's deliberate indifference and failure to train claim.

## C.  Remaining State Law Claims

Once all § 1983 claims are dismissed, the district court has discretion to exercise its supplemental jurisdiction over any remaining state law claims.  *Basista Holdings, LLC v.*

*Ellsworth Township*, 710 F. App'x 688, 694–695 (6th Cir. 2017) (citing 28 U.S.C. § 1367(c)(3)).

"When all federal claims are dismissed before trial, the balance of considerations usually will

point to dismissing the state law claims, or remanding them to state court if the action was

removed." *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996);

*see also* 28 U.S.C. § 1367(c)(3) (stating that a district court may decline to exercise supplemental

jurisdiction if it has "dismissed all claims over which it ha[d] original jurisdiction"). However,

"[a] district court should consider the interests of judicial economy and the avoidance of

multiplicity of litigation and balance those interest against needlessly deciding state law issues."

*Harper v. AutoAlliance International, Inc.*, 392 F.3d 195, 211 (6th Cir. 2004) (quoting *Landefeld*

*v. Marion General Hospital, Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993)).

The Sixth Circuit has not expressly stated a comprehensive list of factors comprising a

balancing test." *Fox v. Brown Memorial Home, Inc.*, 761 F. Supp. 2d 718, 723 (S.D. Ohio

2011). Yet the Sixth Circuit has identified "convenience, comity, fairness, and judicial

economy" as important considerations. *Id.* at 724. Factors to weigh may include: (1) whether

the plaintiff used "manipulative tactics" to attain a state forum; (2) the difficulty or novelty of the

state law claims; (3) how long the case has been before the district court; (4) the district court's

familiarity with the facts through previous substantive rulings; (5) whether a summary judgment

motion is ripe; and (6) whether discovery is complete. *Id.* (citing *Gamel v. City of Cincinnati*,

625 F.3d 949 (6th Cir. 2010); *see also AutoAlliance*, 392 F.3d at 211; *Landefeld*, 994 F.2d at

1182; *Province v. Cleveland Press Publishing Co.*, 787 F.2d 1047, 1055 n. 11 (6th Cir. 1986);

*Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir. 1991)).

Although this case presents a close call, the Court concludes the balancing factors weigh

against exercising jurisdiction. Several factors point in favor of exercising jurisdiction: (1) this

action has been before the district court for a little over a year, (2) the case was not removed from state court, and (3) Defendants' Motion for Summary Judgment is presently before the Court.  However, the Court has no familiarity with the facts through previous substantive rulings. The first motion filed in this case was Defendants' Motion for Summary Judgment.  (ECF No. 18; filed February 28, 2019).  In addition, "although the parties have undertaken and completed discovery, they have done so without the need of Court intervention." *Fox*, 761 F. Supp. 2d at 724–725.  All of the parties, witnesses, and evidence is located in the City of Newark—making Licking County the most convenient forum for this litigation.  Furthermore, Plaintiff did not abandon his federal claims in an attempt to "choose" a state forum.  Finally, the Court's interest in comity weighs heavily in favor of dismissal—namely the avoidance of "needlessly deciding state law issues." *AutoAlliance*, 392 F.3d at 211.

Consequently, the Court **DISMISSES without prejudice** Plaintiff's state law claims.

### IV.

For the reasons stated above, the Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's § 1983 claims for false arrest, civil conspiracy, and malicious prosecution.  (ECF No. 18).  The Court **DISMISSES without prejudice** all state law claims. The Clerk is **DIRECTED** to close the case in accordance with this Opinion and Order.

**IT IS SO ORDERED.**

6-18-2019

**DATE**

EDMUND A. SARGUS, JR.
**CHIEF UNITED STATES DISTRICT JUDGE**

27